**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0902-19

DOUG PERKINS,

      Plaintiff-Respondent/
Cross-Appellant,

v.

BOROUGH OF MANASQUAN,

      Defendant-Appellant/
Cross-Respondent,

and

MONMOUTH COUNTY and
STATE OF NEW JERSEY,

      Defendants.

_____

Argued February 9, 2021 – Decided March 8, 2021

Before Judges Haas, Mawla, and Natali.

On appeal from the Superior Court of New Jersey, Law Division, Monmouth County, Docket No. L-2916-17.

William E. Wells, Jr. argued the cause for appellant/cross-respondent (King Kitrick Jackson

McWeeney & Wells, LLC, attorneys; Mark G. Kitrick, of counsel; William E. Wells, Jr., on the briefs).

Michael Confusione argued the cause for respondent/cross-appellant (Hegge & Confusione, LLC and The Maglione Firm, PC, attorneys; Michael Confusione, Dean R. Malione, and Elizabeth Boylan, of counsel and on the briefs).

PER CURIAM

Defendant Borough of Manasquan appeals from: a January 25, 2019 order denying it summary judgment; an August 8, 2019 decision denying a directed verdict; a September 18, 2019 order entered following a jury trial denying its motion for judgment notwithstanding the verdict; and a September 23, 2019 order granting plaintiff Doug Perkins counsel fees. Plaintiff cross-appeals from the August 12, 2019 jury verdict, which denied him pain and suffering damages and challenges various in limine rulings. We affirm.

In August 2015, plaintiff visited Manasquan Beach. During high tide, plaintiff dove headfirst into the water, in an area posted with a red flag indicating "no swimming," and struck his head on underwater bulkhead that was not visible from above the water. As a result, plaintiff lacerated his skull, and broke his neck and clavicle.

Plaintiff filed suit against defendant as well as Monmouth County and the State. The County and the State were dismissed on summary judgment.

2

Defendant filed a motion for summary judgment arguing the bulkhead constituted unimproved property and therefore it could not be held liable for plaintiff's injuries pursuant to N.J.S.A. 59:4-8 of the Tort Claims Act (TCA). The motion judge denied summary judgment finding questions of fact regarding whether the bulkhead constituted improved property and whether the lifeguard's conduct was negligent and the proximate cause of plaintiff's injuries.

The case was tried by a different judge before a jury over the course of seven days. Plaintiff presented fact witness testimony from his wife who was an eyewitness to the incident, the Manasquan Beach Manager, several lifeguards, friends, a co-worker, his parish priest, a neighbor, and his daughter. He also presented expert testimony from an aquatic safety expert, psychiatrist, orthopedic surgeon, clinical psychologist, and a certified public accountant who testified regarding plaintiff's lost earnings. Defendant also relied upon the fact testimony of the beach manager and lifeguards and presented expert testimony from a neurosurgeon.

Plaintiff's theory of liability alleged defendant was the proximate cause of his injuries because it failed to adequately warn of the dangerous condition through its method of placing red flags on the beach in the vicinity of the bulkhead. Plaintiff's aquatic expert testified flags were insufficient to warn of

3

the presence of the underwater bulkhead. He opined signage containing words or illustrations was necessary to identify the type of danger.

Defendant filed a motion for a directed verdict arguing "the wooden bulkhead in question does not constitute a dangerous condition within the meaning of the [TCA.]" The trial judge denied the motion holding the issue of whether Manasquan acted palpably unreasonable was "clearly" a question for the jury. The jury returned a verdict in favor of plaintiff, finding defendant liable and the 100% proximate cause of plaintiff's injuries. The jury awarded plaintiff $325,000 for past lost wages, but no damages for pain and suffering.

Defendant filed a motion for judgment notwithstanding the verdict or alternatively for a new trial and plaintiff filed a motion seeking counsel fees. Citing Burroughs v. City of Atlantic City, 234 N.J. Super. 208 (App. Div. 1989), defendant argued plaintiff proved neither that the bulkhead was a dangerous condition nor that pursuant to N.J.S.A. 59:4-2 defendant had acted in a "palpably unreasonable" fashion by placing a red flag in the vicinity of the bulkhead and posting lifeguards on the beach.

The trial judge distinguished Burroughs, and made the following findings:

> [T]hat case arose . . . from an accident that occurred
> relating to diving off a boardwalk. And . . . it was clear
> in that case and undisputed, that diving from that
> boardwalk was not permitted. The real issue in that

4

case was whether it was foreseeable, and it seemed to be undisputed in that . . . it was known and foreseeable that individuals were in fact diving from the boardwalk. And that diving from that boardwalk, depending on the tides and the level of the water, could . . . [be] dangerous because the water would be low at certain times.

And there was an ordinance that was passed by the town . . . that prohibited . . . diving from the boardwalk. In addition to that, the [c]ity had posted signs on light stanchions along the boardwalk which read, no diving from boardwalk . . . . So there were signs posted indicating that it was not a permitted use.

In that case, the plaintiff's expert opined that the posted warning was inadequate because it was not located in a way so as to gain the attention of the potential diver. Two, that it did not convey the nature of the hazard posed by the particular conduct. Three, that it did not warn of the hazard with the intensity commensurate with the outcome. Four, that it did not explain how to act to avoid injury. And five, it did not explain the consequences of failing to conform or obey to the admonition.

The expert posited in that case that the warning should read, ["]danger, shallow water, no diving, diving can cause serious injuries.["] The expert suggested that the sign should also contain a symbol for diving surrounded by the international red circle with a slash, indicating that such activity is prohibited. . . .

The testimony of the expert in that case is quite similar, and substantially similar to the testimony of the expert in the instant case. The plaintiff's expert in the instant case . . . opined[] that the use of the red flag in this particular case was inadequate. He testified that in

5

his expert opinion signage warnings should contain certain things, including, [it] should catch someone's attention, it should definitely warn of the condition, and the nature of the condition, and even of the potential resulting injury or harm that can result from the condition.

The plaintiff's expert in this case clearly indicated that the red flags did not meet any of the standards of what he considered to be the standard for signage. That the red flag could mean many things. And the testimony of the various witnesses, giving all inferences of credibility to those witnesses, and leaving to the purview of the jury to balance and weigh all of the testimony, clearly presented that there were different usages that were made of the red flag.

The judge concluded:

based upon the evidence presented, including evidence presented by the defendant's witnesses that indicated what steps were being taken to warn of the bulkhead, the jury could reasonably have found that in fact the condition was dangerous, if it was not dangerous and risk of injury was not foreseeable, there would be no need to warn. And clearly . . . [defendant] had in fact taken steps to warn against that condition. And clearly indicated and testified, admitted on the stand, that yes, running into the bulkhead, swimming into the bulkhead could in fact cause injuries and hence the attempt to warn by use of the red flag.

The [c]ourt also notes that the bulkhead, and this again was undisputed from the testimony, during high tide is not visible, which again is a fact that the jury could have certainly taken into consideration and given weight to. . . .

6

So based upon all the evidence that was submitted, including the photographs and the testimony, the [c]ourt cannot find that the jury's finding that the bulkhead was a dangerous condition is . . . not supported by the weight of the evidence.

The judge also found no grounds to second-guess the jury's finding that defendant's placement of red flags as a form of warning constituted palpably unreasonable conduct. She stated:

[A] review of the record reflects that a reasonable jury could conclude that given the condition, the nature of the condition, and the nature of the danger, as well as the combination with the foreseeable permitted use of the property, the use of the red flag alone was not a reasonable mechanism by which to warn of the danger.

The court concluded defendant's arguments "[l]argely . . . rest on questions of credibility [which was] . . . within the purview of the jury . . . ."

On September 23, 2019, the court issued a judgment in the amount of $262,479.67 for past lost wages, representing the sum awarded by the jury less a $62,520.33 credit for Social Security Disability payments. The court also ordered defendant to pay attorney fees in the amount of $87,405.73 out of a total of $300,360 sought.

I.

On appeal, defendant argues the bulkhead was part of the beach and unimproved land, and the trial court should have granted summary judgment

7

pursuant to the TCA. It asserts the trial judge erred when she denied defendant's motions for a directed verdict and judgment notwithstanding the verdict because the underwater bulkhead was not a dangerous condition since plaintiff disregarded the posted red flag warning, signage, and the lifeguard's attempts to whistle him away from the bulkhead. Defendant alleges there is no evidence of causation. It also argues counsel fees were not compensable because the jury did not award future economic losses.

We review "an order [on] summary judgment in accordance with the same standard as the motion judge." Bhagat v. Bhagat, 217 N.J. 22, 38 (2014) (citations omitted). We "must review the competent evidential materials submitted by the parties to identify whether there are genuine issues of material fact and, if not, whether the moving party is entitled to summary judgment as a matter of law." Ibid. (citing Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540 (1995); R. 4:46-2(c)). We review the facts in a light most favorable to the non-moving party, "keeping in mind '[a]n issue of fact is genuine only if, considering the burden of persuasion at trial, the evidence submitted by the parties on the motion . . . would require submission of the issue to the trier of fact.'" Schiavo v. Marina Dist. Dev. Co., LLC, 442 N.J. Super. 346, 366 (App. Div. 2015) (first alteration in original) (quoting R. 4:46-2(c)).

Similarly, a motion for directed verdict must be denied if,

> accepting as true all the evidence which supports the position of the party defending against the motion and according [them] the benefit of all inferences which can reasonably and legitimately be deduced therefrom reasonable minds could differ. . . . [W]e apply the same standard that governs the trial courts.
>
> [Vitale v. Schering-Plough Corp., 447 N.J. Super. 98, 119-20 (App. Div. 2016) (second alteration in original) (internal citations omitted).]

We apply the same standard as the trial court to determine whether a moving party is entitled to judgment notwithstanding the verdict. Riley v. Keenan, 406 N.J. Super. 281, 298 (App. Div. 2009). We have described the court's review function as "quite a mechanical one" of determining

> whether "the evidence, together with the legitimate inferences therefrom, could sustain a judgment in . . . favor" of the party opposing the motion; i.e., if, accepting as true all the evidence which supports the position of the party defending against the motion and according him the benefit of all inferences which can reasonably and legitimately be deduced therefrom, reasonable minds could differ . . . .
>
> [Judge v. Blackfin Yacht Corp., 357 N.J. Super. 418, 424 (App. Div. 2003) (alterations in original) (quoting Dolson v. Anastasia, 55 N.J. 2, 5 (1969)).]

9

A judgment notwithstanding the verdict will be denied where the verdict is based primarily on credibility determinations. Alves v. Rosenberg, 400 N.J. Super. 553, 566 (App. Div. 2008) (citation omitted). However,

> [s]uch credibility determinations . . . may be removed from the jury's purview and a directed verdict granted when the testimony provided is uncontradicted and reliable, i.e., the testimony "is not improbable, extraordinary or surprising in its nature, or [where] there is no other ground for hesitating to accept it as the truth . . . ."
>
> [Ibid. (third and fourth alterations in original) (quoting Ferdinand v. Agric. Ins. Co. of Watertown, N.Y., 22 N.J. 482, 494, 498 (1956)).]

In Ferdinand, the Court explained,

> when the testimony of witnesses, interested in the event or otherwise, is clear and convincing, not incredible in the light of general knowledge and common experience, not extraordinary, not contradicted in any way by witnesses or circumstances and so plain and complete that disbelief of the story could not reasonably arise in the rational process of an ordinarily intelligent mind, then a question has been presented for the court to decide and not the jury.
>
> [22 N.J. at 494 (citations omitted).]

A "jury's factual determination will be disturbed only if we find that the jury could not have reasonably used the evidence to reach its verdict." Sons of Thunder, Inc. v. Borden, Inc., 148 N.J. 396, 415 (1997).

10

A.

Defendant challenges the motion judge's denial of summary judgment arguing the bulkhead is a subaqueous part of the beach and "a vertical shore protection structure installed to withstand the forces of waves and currents." Defendant likens the bulkhead to sand dunes whose purpose is to preserve the beach for public enjoyment. It argues summary judgment was appropriate because "bulkheading for a beach bears a direct 'relation to the natural condition' . . . [and] without bulkheading (or dune creation, or sand replenishment, etc.) there is no 'beach' for purposes of the immunities intended by N.J.S.A. 59:4-8."

N.J.S.A. 59:4-8 states: "Neither a public entity nor a public employee is liable for an injury caused by a condition of any unimproved public property, including but not limited to any natural condition of any lake, stream, bar, river or beach." Addressing whether the bulkhead met this definition, the motion judge stated:

> The Supreme Court stated [in Troth v. State, 117 N.J. 258 (1989)] that it's not difficult to identify the factors that determine when property is improved to an extent sufficient to eliminate the immunity.
>
> Public property is no longer unimproved when there has been a substantial physical modification of the property from its natural state and that the physical change creates hazards that did not previously exist and that require management by the public entity.

11

The Court in Troth went on to specify that the hazard created by the physical alteration of the property, in that case the construction of a [2000] foot long dam, posed a hazard to safety sufficient to require a public entity to assume responsibility for their operation and maintenance.

The Supreme Court therefore held that the State was not immunized from liability as the dam was not an improved public property.

. . . .

As I've said in prior opinions, under the [TCA], the public entity is liable for injury caused by a condition of the property if the plaintiff establishes that the property was in a dangerous condition at the time of the injury, that the injury was proximately caused by a dangerous condition and that the dangerous condition created a reasonably foreseeable risk of the kind of injury which was incurred. And that either a negligent act or a . . . wrongful act or omission of an employee of the entity within the scope of his employment created the dangerous condition or . . . a public entity has actual or constructive notice of a dangerous condition under [N.J.S.A.] 59:4-3 a sufficient time prior to the injury to have taken measures to protect against the condition.

The motion judge concluded defendant had "not provided adequate evidence that the bulkhead in question was unimproved property, though the improvement to the property by the unnatural condition of the bulkhead clearly does not rise to the level of an improved property referenced by the Court in Troth." She stated:

12

The question of fact remains as to whether a reasonable jury could conclude that the bulkhead is improved property under the definition of the statute.

Additionally[,] even if the [c]ourt were to conclude that the bulkhead is unimproved public property, a question of fact still remains as to whether the lifeguard's conduct was negligent and was a proximate cause of plaintiff's injuries.

Plaintiff argues that the lifeguard's conduct was beyond a failure to warn and in fact lured plaintiff to the specific hazard which caused his injuries.

Based on the case law presented by plaintiff and again viewing the facts in a light most favorable to plaintiff, a reasonable jury could conclude that the placement of warning flags was confusing and was a proximate cause of plaintiff's injury and as such would impose liability upon defendant even if the [c]ourt were to determine the defendant would have otherwise had immunity.

Our de novo review leads us to the same conclusion as the motion judge. We are unconvinced defendant met its burden of proving the bulkhead was "unimproved public property" pursuant to N.J.S.A 59:4-8 to be granted summary judgment. Moreover, summary judgment was inappropriate because plaintiff's theory of the case posited his injury was caused by "defendant's palpably unreasonable use of flags that created a hazardous condition by . . . luring plaintiff into this artificial, hidden danger." This was a question for the jury, which could not be decided on summary judgment.

Defendant argues the trial judge should have granted its trial motion for a directed verdict or its post-judgment motion for a judgment notwithstanding the verdict because "there was no legally 'dangerous' condition[,] . . . plaintiff's minimal evidence on causation[] failed as a matter of law[, and] . . . plaintiff's criticism of [defendant's] allocation of resources vis-à-vis the bulkheading, was not evidence of [palpable] unreasonableness."  We disagree.

N.J.S.A. 59:4-2 states:

> A public entity is liable for injury caused by a condition of its property if the plaintiff establishes that the property was in dangerous condition at the time of the injury, that the injury was proximately caused by the dangerous condition, that the dangerous condition created a reasonably foreseeable risk of the kind of injury which was incurred, and that either:
>
> > a.  a negligent or wrongful act or omission of an employee of the public entity within the scope of his employment created the dangerous condition; or
> >
> > b.  a public entity had actual or constructive notice of the dangerous condition under section 59:4-3 a sufficient time prior to the injury to have taken measures to protect against the dangerous condition.

The trial judge made the following findings:

[T]he jury was presented with the question, was the bulkhead a dangerous condition. And the jury concluded by its verdict that in fact the bulkhead was a dangerous condition.

Whether or not the plaintiff was exercising due care, again is a question that was submitted to the jury, which again the jury based upon its testimony, its evaluation of the evidence, including credibility determinations, determined that the plaintiff was not negligent and was exercising due care in the use of the property.

The [c]ourt is also satisfied that based upon the evidence presented, including evidence presented by the defendant's witnesses that indicated what steps were being taken to warn of the bulkhead, the jury could reasonably have found that in fact the condition was dangerous, if it was not dangerous and risk of injury was not foreseeable, there would be no need to warn. And clearly [defendant] had in fact taken steps to warn against that condition. And clearly indicated and testified, admitted on the stand, that yes, running into the bulkhead, swimming into the bulkhead could in fact cause injuries and hence the attempt to warn by use of the red flag.

The [c]ourt also notes that the bulkhead, and this again was undisputed from the testimony, during high tide is not visible, which again is a fact that the jury could have certainly taken into consideration and given weight to. Low tide it's visible, it would be obvious. At high tide, it is not visible, and it is not obvious. And it was clear from the testimony, and it was undisputed that at the time of this incident, it was high tide, and that the bulkhead was not visible.

15

So[,] based upon all the evidence that was submitted, . . . the [c]ourt cannot find that the jury's finding that the bulkhead was a dangerous condition is beyond the weight of . . . the evidence.

Our review of the record similarly convinces us there was more than "minimal evidence" presented to the jury regarding whether the bulkhead was a dangerous condition. Indeed, the fact witnesses disputed what the flag in the vicinity of the bulkhead signified and disputed whether the signage at the entrance to the beach explained what the flag meant. Plaintiff's aquatic safety expert explained why the flag system was an inadequate means of warning about the dangerous condition. Furthermore, as the trial judge noted, the testimony was rife with credibility determinations that only the jury could make. Defendant's witnesses, which included the beach manager and several lifeguards, were all fact witnesses who testified regarding the beach operations, the purpose of the signage and flags placed on the beach, and the incident itself. Acceptance of their testimony was predicated on their credibility. For these reasons, the trial judge did not err by refusing to enter a directed verdict and denying judgment notwithstanding the verdict.

C.

We also reject defendant's argument it was an error to award counsel fees. Defendant concedes N.J.S.A. 59:9-5 permits an award of counsel fees when

16                                                               A-0902-19

there is no recovery for pain and suffering. However, citing Nickerson v. City

of Newark, 220 N.J. Super. 284 (Law Div. 1987), it argues "such awards are not

legislatively mandated . . . ."

The TCA states:

> In any action brought against a public entity . . . under this act, the court may, in its discretion, award a successful claimant (a) costs ordinarily allowable in the private sector (b) expert witness fees not exceeding a total of $100[] and (c) reasonable attorney's fees; provided however that there shall be no recovery in any case where damages are awarded for pain and suffering.
>
> [N.J.S.A. 59:9-5.]

The trial judge quoted the following comment to the TCA:

> "the underlying policy as to damages in this Act is to reimburse an injured claimant to the full extent of his present and projected economic loss. Consistent with this thesis discretion is vested in the trial judge to compensate a successful claimant against either a public entity or a public employee for the reasonable amount of his attorney's fees and for $100[] worth of his expert witness fee. This is done in order to ensure that a claimant is compensated for virtually all of its economic losses."

She then stated:

> That particular last sentence regarding compensating the plaintiff for virtually all his economic losses, as well as the underlying policies to again reimburse an injured claimant to the full extent of his present and projected economic loss, is the center of the

17

cases that were cited both by the plaintiff and defendant, . . . when considering an application as the one before this [c]ourt.

The motion judge properly applied N.J.S.A. 59:9-5 in awarding plaintiff counsel fees. Nickerson, was not binding on the trial judge and was not a case in which the court declined to award fees, but rather awarded plaintiff's attorneys one-third of the fees because under the facts of that case, awarding the entirety of the fees sought would be a windfall. The counsel fees award here was less than one-third of the total fees sought and was neither a windfall nor an abuse of discretion.

## II.

On the cross-appeal, plaintiff challenges the court's in limine rulings and argues the judge permitted defendant to adduce testimony regarding complex medical diagnoses rendered by the non-testifying doctors, which constituted improper hearsay. Plaintiff also argues the trial judge precluded him, his witnesses, and counsel from telling the jury he was declared disabled by the Social Security Administration (SSA), which deprived him of a fair trial. He asserts the judge precluded him from highlighting in summation the absence of evidence produced by defendant.

A-0902-19

Plaintiff argues the cumulative effect of these errors deprived him "of a fair trial on the central issue of whether he suffered a permanent bodily injury warranting an award of damages for pain and suffering." He alleges this is the reason why the jury only awarded him economic damages.

> Our review of the trial court's evidential rulings "is limited to examining the decision for abuse of discretion." Parker v. Poole, 440 N.J. Super. 7, 16 (App. Div.[ 2015]) (quoting Hisenaj v. Kuehner, 194 N.J. 6, 12 (2008)), certif. denied, 223 N.J. 163 (2015). We will only reverse if the error "is of such a nature as to have been clearly capable of producing an unjust result." Ibid. (quoting R. 2:10-2).
>
> [Ehrlich v. Sorokin, 451 N.J. Super. 119, 128 (App. Div. 2017).]

"The admission or exclusion of expert testimony is committed to the sound discretion of the trial court. . . . [A] trial court's grant or denial of a motion to strike expert testimony is entitled to deference on appellate review." Townsend v. Pierre, 221 N.J. 36, 52 (2015) (internal citations omitted).

A.

The trial judge did not abuse her discretion when she denied plaintiff's request to reference the SSA disability determination. In Villanueva v. Zimmer, 431 N.J. Super. 301 (App. Div. 2013), we held that a plaintiff could not reference the SSA determination because it constituted hearsay. We stated:

19

N.J.R.E. 803(c)(8) does not authorize the admission of an SSA determination of disability as a hearsay exception in the circumstances of this case. The plain terms of the rule simply do not authorize the admission of an SSA determination that plaintiff is disabled, to be utilized as substantive evidence in a personal injury action where plaintiff has the burden of proving she suffered an injury caused by an accident and that the injury impaired her ability to work.

. . . .

An SSA disability determination is of dubious probative value in a personal injury action, in any event. The lack of a meaningful adversarial process with respect to the cause, existence and extent of a plaintiff's alleged disability renders the SSA's conclusions on that issue unreliable.

. . . .

Also, an SSA disability determination must be periodically reviewed and is subject to being overturned. A jury, however, cannot be asked years later to reverse itself based on an SSA disability determination that was later overturned.

[Id. at 317-19.]

Moreover, here, there was no evidence the ruling prejudiced plaintiff's case because he adduced testimony from several fact witnesses, including: friends, a co-worker, a parish priest, a neighbor, and his daughter and wife, explaining in detail plaintiff's condition prior to and after the accident and describing the activities he could no longer perform as a result of the accident.

20

Moreover, plaintiff's medical and psychological experts explained the severity of his injuries and their impact on his physical and mental functioning and ability to work.

The trial judge did not err when she prevented plaintiff's counsel from telling the jury during summation that the defense failed to present expert testimony. During summations, plaintiff's counsel stated: "It's the evidence you fail to see. Did you see any experts come in[?]" This drew an objection from defendant's counsel, and the following colloquy occurred at sidebar:

> [Defendant's counsel]: Under the case law it's clearly prohibited to draw a negative inference if I don't call an expert that I clearly retained for the purpose of this trial.
>
> [The Court]: I'm going to sustain it.
>
>             . . . .
>
> [Plaintiff's counsel]: Well I'm not asking for an inference. I'm allowed to reference the fact that they don't have an expert. I disagree with [defendant's counsel's] analysis of the law.
>
> [The Court]: It depends how you're going to argue it.
>
> [Plaintiff's counsel]: Well all I'm saying is they didn't hear from an expert, that's it.
>
>             . . . .
>
> [The Court]: I think you could say what evidence you presented or what evidence was not presented.

[Plaintiff's counsel]:  Okay.

[The Court]:  But no reference to not retaining experts. That's prohibited.

[Defendant's counsel]:  Okay, so you're going to sustain that?

[The Court]:  I'll sustain.

Addressing the jury, plaintiff's counsel then stated:  "What evidence did you hear from the defense regarding their alleged reasonableness of this flagging system[?]" and proceeded to address the damages part of his summation.

In Washington v. Perez, 219 N.J. 338, 343 (2014), our Supreme Court held an adverse inference charge should rarely be invoked to address the absence of an expert.  The Court explained

> [t]here are significant distinctions between the testimony of expert witnesses and the testimony of fact witnesses, which are pertinent to the adverse inference charge. . . .
>
>     . . . .
>
> . . . [I]n contrast to the fact witness setting, there are many strategic and practical reasons that may prompt a party who has retained an expert witness to decide not to present the expert's testimony at trial. . . .
>
> Thus, when the witness whom a party declines to call at trial is an expert rather than a fact witness, the factors that may necessitate an adverse inference charge

A-0902-19

> addressing the absence of a fact witness are unlikely to be germane.
>
> [Id. at 361-64.]

The judge's ruling constituted a sound application of the law. Plaintiff was not prejudiced because his counsel was permitted to discuss the lack of evidence defendant presented in summation without referring to the lack of expert testimony. We discern no reversible error.

### B.

We next address plaintiff's challenges to the in limine motion rulings. Plaintiff asserts a CT scan, which was reviewed by a non-testifying doctor who concluded there was "[n]o intracranial bleed[,]" was a "complex medical diagnosis" and the "court erred in permitting reference to [the non-testifying doctor's] complex medical diagnoses" through the testifying expert at trial. Plaintiff argues this was inadmissible hearsay under N.J.R.E. 801(c) and our holding in James v. Ruiz, 440 N.J. Super. 45 (App. Div. 2015).

Similarly, plaintiff argues the court erred by permitting defense counsel to cross-examine the treating psychiatrist about memory and cognitive ability opinions authored by a non-testifying doctor. He asserts the testifying doctor "never performed a memory test on plaintiff . . . [and] this testimony unfairly

prejudiced plaintiff's presentation of his case by confusing the jury and seeming

to present [the testifying doctor] as contradicting plaintiff's other experts."

In deciding the in limine motions, the trial judge stated:

> The plaintiff relies primarily on James . . . for the proposition that . . . complex medical diagnoses of nontestifying experts cannot be brought in through the testimony of other experts and the contention by the defendants is that that premise was further refined by the [c]ourt in Gonzales [v. Hugelmeyer, 441 N.J. Super. 451 (App. Div. 2015)] indicating that the [c]ourt in Gonzalez recognized that experts can in fact rely on testimony or findings of nontestifying experts if that opinion is not disputed.
>
> And it seems clear to the [c]ourt . . . the fact that the CT scan showed no bleeding is at all not disputed. Plaintiff's position on that is that, whether it's disputed or not is not the point. The point is that no one relied on those findings because their doctors have indicated that you would not see the type of injury that occurred in this case, you would not see it in a CT scan.
>
> The [c]ourt's review of the testimony as well as argument from counsel clearly indicates that the doctor was cross[-]examined on this, and was redirected on this and in a review of the [c]ourt's findings in Gonzalez the [c]ourt agrees with the defense that particularly since the finding in that CT scan is not disputed, that the concerns raised in James . . . are not at issue in this case.
>
> In addition to that, the [c]ourt also finds that to the extent that it was raised in cross[-]examination based upon the fact that plaintiff's expert did review the medical records of the plaintiffs, did indicate in their

24

reports the various diagnostics that they reviewed including the CT scan that that is sufficient to allow cross[-]examination on what they reviewed, why they reviewed it and whether they relied upon it or not.

And to the extent that the experts can testify that they didn't rely on it because it's not relevant to the injury here in question then that is the expert's position. And in fact, the jury charge that [the court] would charge the jury on with regard to hearsay testimony of experts relying on the opinions of nontestifying experts specifically say that the jurors are to consider that testimony only in their determination of the basis of the expert's opinion and not as substantive evidence of finding of that expert and that they can take into consideration whether the expert relied or did not rely on that opinion.

Plaintiff cites Brun v. Cardoso, 390 N.J. Super. 409, 421 (App. Div. 2006), where we held the "'interpretation of an MRI may be made only by a physician qualified to read such films,' and an MRI report [could ]not be 'bootstrapped into evidence through [another doctor's] testimony.'" However, our holding in Brun was dependent "on the complexity of MRI interpretations" and we held that "before introducing complex medical reports pursuant to N.J.R.E. 803(c)(6), the ability of the opposing side to cross-examine the author of such a report must be assured." Id. at 421 (citing Norwacki v. Cmty. Med. Ctr., 279 N.J. Super. 276, 282-83 (App. Div. 1995) (stating "medical opinions in hospital records should not be admitted under the business records exception where the opponent will

25

be deprived of an opportunity to cross-examine the declarant on a critical issue such as the basis for the diagnosis or cause of the condition in question.")).

Therefore, Brun is inapposite because the parties agree the contents of the CT scan were not in dispute. In Brun, the defendant was surprised by the change in testimony. Here, there were no such concerns. The judge did not abuse her discretion.

Plaintiff argues his orthopedic expert opined plaintiff suffered from epicondylitis as a result of the accident, requiring surgery to his right elbow. He asserts the trial judge erred when she permitted defendant's neurosurgeon expert to testify regarding the condition of plaintiff's right elbow was degenerative, and the opinion should have been excluded because it exceeded the scope of defendant's expert's report.

On this issue, the trial judge stated:

> It's not disputed . . . that [defendant's expert] in his reports did not note his . . . opinion regarding the injuries to the right elbow and that there was no supplemental report issued by the defendants from [the expert] about the right elbow nor were there any amendments to interrogatories regarding [the expert's] report regarding the right elbow.
>
> . . . .
>
> This issue was address[ed] . . . in Congiusti [v.] Ingersoll-Rand Co., Inc., 306 N.J. Super. 126 [(App.

A-0902-19

Div.] 1997) wherein . . . the [c]ourt laid out a three part test for the allowance of evidence that would be outside the report. . . . [T]he [c]ourt needed to look at whether, one, there was an absence of a design to mislead, an absence of the element of surprise if the evidence was admitted and three, absen[ce] of prejudice that would result from the admission of the evidence and if there was not an absence of these factors, then the testimony could be excluded.

The plaintiffs also argue in support of their motion that to the extent that the [c]ourts have recognized that an expert can testify beyond the confines of the report if the opinion logically predicates from statements that are already in the report is not applicable here because the plaintiffs contend that that opinion is not predicated on anything that [defendant's expert] said in any of his prior reports because he simply never mentioned the right elbow in his prior reports.

Notwithstanding those arguments, the [c]ourt does have to weigh in this particular situation the probative value versus the prejudicial value. [P]laintiff[ is] clearly making a case that [he] suffered an injury to his right elbow as a result of this accident. Although the deposition of [defendant's expert] was a de bene esse deposition which is a trial deposition, the [c]ourt does have to weigh the fact that that deposition . . . occurred in . . . April of 2019.

There has been opportunity for the plaintiffs to address this issue to the extent that they felt that they were prejudiced in any way. Applications could have been made to recall so to speak [defendant's expert] in order for them to address this issue. There could have been application to the extent that would have led to increased costs on the part of the plaintiffs to have to

27

A-0902-19

> appear at and prepare, and/or prepare supplemental reports.
>
> There could have been applications on the part of the plaintiff to address that with the [c]ourt and have the defendants potentially bear the cost of that re-deposition or to the extent that they wanted to again extend the deposition of [defendant's expert] to have an opportunity to further explore that opinion. That was available to the plaintiffs and that mitigates any prejudice that there would have been with regards to that opinion being raised at the time of [the expert's] de bene esse deposition.

The judge also noted there was no intentional design to mislead and it would not have been a surprise to plaintiff that defendant's expert would opine on plaintiff's elbow, as plaintiff was "on notice that the injuries in this matter were being contested."

We affirm substantially for the reasons expressed by the trial judge. We add that plaintiff's motion was made the day of opening arguments. We have stated: "An in limine motion, filed at such late date, is permissible only when it addresses preliminary or evidentiary issues. Even then, such motions are 'disfavor[ed.]'" L.C. v. M.A.J., 451 N.J. Super. 408, 411 (App. Div. 2017) (alterations in original) (quoting Cho v. Trinitas Reg'l Med. Ctr., 443 N.J. Super. 461, 470 (App. Div. 2015)). Although plaintiff's in limine motion sought to address an evidentiary issue, as the trial judge noted, it should have been

addressed well in advance of trial.  For these reasons we conclude the judge did not abuse her discretion.

The errors alleged by plaintiff on the cross-appeal neither individually nor collectively constitute cumulative error warranting a reversal.

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-0902-19